IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

MAR 5

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **UNDER SEAL** |
| ) | |
| v. ) | Case No. 1:20-CR-67 |
| ) | |
| BRODIE SHAW THOMSON, ) | Count 1: 41 U.S.C. §§ 8702 and 8707; 18 U.S.C. § 2 |
| ) | (Solicitation and Acceptance of a Kickback) |
| Defendant. ) | |
| ) | |
| ) | Counts 2-4: 18 U.S.C. §§ 1343, 1346, and 2 |
| ) | (Honest Services Wire Fraud) |
| ) | |
| ) | Forfeiture Notice |

## INDICTMENT

March 2020 Term - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

Unless otherwise noted, at all times relevant to this Indictment:

1.      Defendant BRODIE SHAW THOMSON ("THOMSON") was a resident of Woodbridge, Virginia and an employee of Company A, a Virginia corporation with offices in Arlington, Virginia, within the Eastern District of Virginia, and elsewhere. THOMSON was employed as a Senior Vice President at Company A. As its employee, THOMSON owed a fiduciary duty to Company A.

2.      Company A specialized in providing behavioral health and other specialty services to agencies of the federal government, including the United States military.

1

3. Company B was a Delaware corporation formed in or around 2010. Company B was based in Springfield, Oregon.

4. Company C was a Virginia corporation with offices in the Eastern District of Virginia that provided a variety of services to the federal government including but not limited to engineering, financial management, education and training, internet technology and technical support, and supply chain management.

5. Person 1 was the sole owner and the President of Company B.

6. Person 2 was an assistant and bookkeeper for Company B.

7. Person 3 was Director at Company A until in or around October 2010, when Person 3 became a Vice President at Company A. In or around June 2015, Person 3 became a Senior Vice President at Company A.

8. Person 4 was a Director at Company A until in or about August 2011 when Person 4 became a Vice President at Company A.

9. The United States Department of Defense ("DoD") was a department and agency of the United States.

10. The United States Department of Health and Human Services ("HHS") was a department and agency of the United States.

11. The United States Army was a branch of the United States Armed Forces within the DoD.

12. The United States Marine Corps was a branch of the United States Navy, which was a branch of the United States Armed Forces within the DoD.

13. Between in or about January 2010 and in or about July 2015, Company A was a prime contractor and a subcontractor on numerous federal government contracts, and Company

2

A subcontracted work under those contracts to Company B. Those contracts included, but were not limited to, the following:

    a.    In or around 2008, Company C was selected as a prime contractor on an indefinite delivery, indefinite quantity ("IDIQ") contract administered by the HHS (the "HHS Contract"). As one of the prime contractors on the IDIQ, Company C could compete with other prime contractors for work to supply various services to federal government agencies and departments, including the DoD. Company C was awarded work as a prime contractor under this IDIQ, and Company C subcontracted portions of its work under the HHS Contract to Company A. Between in or around August 2010 and in or around June 2012, Company A subcontracted work to Company B under this contract through a series of purchase orders.

    b.    On or about November 4, 2010, Company A was one of several companies that was selected as a prime contractor on an IDIQ contract administered by the U.S. Army (the "Army IDIQ"). As one of the prime contractors on the IDIQ, Company A could compete with other prime contractors for work to supply support services to components within the DoD, including but not limited to personnel support, wellbeing support, and help desk support services.

    c.    In or about September 2011, Company A was awarded a task order as a prime contractor on the Army IDIQ to provide support services for the U.S. Army's Sexual Harassment / Assault Response and Prevention program (the "SHARP Contract."). Between in or about January 2012 and in or about September 2013, Company A subcontracted work to Company B on the SHARP Contract.

d. On or about July 13, 2012, the Mission and Installation Contracting Command within the DoD awarded Company A a task order under the Army IDIQ to perform work for the Office of the Secretary of Defense (the "OSD Contract"). Among other things, the OSD Contract required Company A to supply personnel to coordinate and supply certain services to wounded, ill, or injured services members at a fixed labor price to the United States government. Between in or around November 2012 and in or around July 2015, Company A subcontracted portions of the work under the OSD Contract to Company B through a series of purchase orders.

e. In or around June 2013, the United States Marine Corps awarded a prime contract to Company C to provide the United States Marine Corps Wounded Warrior Regiment with, among other things, recovery care coordinators to oversee and assist with the recovery and rehabilitation of wounded veterans (the "RCC Contract"). Company C subcontracted portions of the work on the RCC contract to Company A, and Company A further subcontracted portions of this work to Company B.

14. Prior to 2010, neither Company B nor Persons 1 and 2 had any experience or expertise in providing services to injured or wounded persons, organizing or managing training in adaptive sports or athletic reconditioning, providing services to veterans, or federal government contracting.

<u>Scheme and Artifice</u>

15. Between no later than in or about 2010 and in or about July 2015, BRODIE SHAW THOMSON engaged in a scheme and artifice to defraud by depriving Company A of the intangible right of honest services through bribes and kickbacks.

4

16. A purpose of the scheme was for THOMSON to unjustly enrich himself and others by soliciting, accepting, and attempting to accept kickbacks and bribes from Company B in return for THOMSON providing favorable treatment to Company B in connection with prime government contracts and subcontracts awarded to Company A, including but not limited to favorable treatment in connection with the HHS Contract, the SHARP Contract, the OSD Contract, and the RCC Contract, and subcontracts or purchase orders related to those contracts. THOMSON solicited, accepted, and attempted to accept more than approximately $4 million from Company B in exchange for influencing Company A to give Company B favorable treatment.

17. In furtherance of the scheme to defraud, and to accomplish its unlawful objects, the following manner and means were used, among others:

   a. THOMSON solicited, accepted, and received payments from Company B in exchange for THOMSON using his position at Company A to provide favorable treatment to Company B, including influencing the award of work to Company B on Company A's prime government contracts and subcontracts.

   b. THOMSON directed Company B how much to invoice Company A for the labor Company A subcontracted to Company B on federal government prime contracts and subcontracts.

   c. THOMSON directed Company B to pay THOMSON a percentage of Company B's profits on the labor invoiced to Company A.

   d. Beginning in or around June 2013, THOMSON directed Company B to pay THOMSON, Person 3, and Person 4 each a percentage of Company B's profits on the labor invoiced to Company A under the RCC Contract.

5

      e.    In order to conceal the true nature of the payments from Company A to THOMSON, THOMSON referred to the kickback payments as consulting fees and instructed Person 1 and Person 2 to do the same.

      f.    THOMSON also created a sham consulting agreement and sham sales agreements to make it appear as though the payments from Company B to THOMSON were for commercial business plans unrelated to federal government contracts and subcontracts, when in truth and in fact, the payments from Company B were in exchange for THOMSON using his position to influence Company A to provide favorable treatment to Company B.

      g.    THOMSON did not disclose to Company A that he was receiving payments from Company B.

18.    The above introductory allegations are re-alleged and incorporated into each count of this indictment as if fully set forth in each count.

## COUNT 1

(Solicitation and Acceptance of a Kickback)

19. On or about March 21, 2015, in the Eastern District of Virginia and elsewhere,

BRODIE SHAW THOMSON

knowingly and willfully solicited, accepted, and attempted to accept a kickback in the form of a check in the amount of $81,945.56 payable to Brodie Thomson and drawn on a bank account of Company B. THOMSON, an employee of Company A, solicited, accepted, and attempted to accept the kickback as an improper reward for providing favorable treatment to Company B by Company A in connection with a prime contract entered into by the United States and a subcontract relating to a prime contract entered into by the United States.

(In violation of Title 41, United States Code, Sections 8702 and 8707, and Title 18, United States Code, Section 2.)

## COUNTS 2 - 4

(Honest Services Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

20.    Beginning no later than in or about January 2010, and continuing through at least in or about July 2015, in the Eastern District of Virginia and elsewhere,

**BRODIE SHAW THOMSON**

did knowingly devise and intend to devise a scheme and artifice to defraud by depriving Company A of the intangible right of honest services through bribes and kickbacks.

### Executions

21.    On or about the dates listed below, for the purpose of executing the scheme and artifice to defraud described more fully in paragraphs 15 through 18, in the Eastern District of Virginia and elsewhere,

**BRODIE SHAW THOMSON**

transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as described below:

| Count | Date | Description |
|---|---|---|
| 2 | March 21, 2015 | Wire communication to process and clear a deposited check made payable to Brodie Thomson in the amount of $81,945.56 |
| 3 | June 17, 2015 | An email sent from BRODIE SHAW THOMSON with a subject line of "Re: Labor Info for Brodie to price Camps/Clinic April/May," in which THOMSON provided Company B with amounts to bill Company A and the amount to pay THOMSON in kickbacks, referred to as "Total Consulting Fee" |
| 4 | June 19, 2015 | An email sent from BRODIE SHAW THOMSON with a subject line of "Re: Labor Info for Brodie to price Camps/Clinic April/May," in which THOMSON provided Company B with revised amounts to bill Company A and a revised amount to pay THOMSON in kickbacks, referred to as "Total Consulting Fee" |

(In violation of Title 18, United States Code, Sections 1343, 1346, and 2.)

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE, AS DESCRIBED BELOW:

22. Pursuant to Federal Rule of Criminal Procedure 32.2(a), the defendant, BRODIE SHAW THOMSON, is hereby notified that, if convicted of any of the offenses alleged in Counts 2 through 4 of the Indictment, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as the result of the Count or Counts of conviction. That property includes, but is not limited to, the following:

    a. A sum of money equal to at least $4,136,502.95 in United States currency, representing the amount of proceeds obtained by the defendant as a result of the offenses.

23. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by 28 U.S.C. § 2461(c), the defendant shall forfeit substitute property, up to the value of $4,136,502.95 in United States currency if, by any act or omission of the defendant, the property directly derived from the charged violations cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

A TRUE BILL

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office
FOREPERSON OF THE GRAND JURY

G. Zachary Terwilliger
United States Attorney

By: *Heidi B. Gesch* (signature)
Heidi Boutros Gesch
Jack Hanly
Kimberly R. Pedersen
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981