

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRODIE SHAW THOMSON,<br><br>Defendant. | Case No. 1:20-CR-67 (AJT) |

## STATEMENT OF FACTS

### Facts Relating to Charged Offenses

The United States and the defendant, BRODIE SHAW THOMSON, stipulate and agree that the following allegations are true and correct, and further stipulate and agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

### I. Factual Background

1. The defendant, BRODIE SHAW THOMSON (hereinafter "THOMSON" or "the defendant"), was a resident of Woodbridge, Virginia and an employee of Company A, a Virginia corporation with offices in Arlington, Virginia, within the Eastern District of Virginia, and elsewhere. THOMSON was employed as a Senior Vice President at Company A. As its employee, THOMSON owed a fiduciary duty to Company A.

2. Company A specialized in providing human capital services to agencies of the federal government, including the United States military.

3. Company B was a Delaware corporation formed in or around 2010. Company B was based in Springfield, Oregon.

1

4. Company C was a Virginia corporation with offices in the Eastern District of Virginia that provided a variety of services to the federal government including but not limited to engineering, financial management, education and training, internet technology and technical support, and supply chain management.

5. Person 1 was the sole owner and the President of Company B.

6. Person 2 was an assistant and bookkeeper for Company B.

7. Between in or about January 2010 and in or about July 2015, Company A was a prime contractor and a subcontractor on numerous federal government contracts, and Company A subcontracted work under those contracts to Company B. Those contracts included the following:

   a. In or around 2008, Company C was selected as a prime contractor on an indefinite delivery, indefinite quantity ("IDIQ") contract administered by the HHS (the "HHS Contract"). As one of the prime contractors on the IDIQ, Company C could compete with other prime contractors for work to supply various services to federal government agencies and departments, including the U.S. Department of Defense ("DoD"). Company C was awarded work as a prime contractor under this IDIQ, and Company C subcontracted portions of its work under the HHS Contract to Company A. Between in or around August 2010 and in or around June 2012, Company A subcontracted work to Company B under this contract through a series of purchase orders.

   b. On or about November 4, 2010, Company A was one of several companies that was selected as a prime contractor on an IDIQ contract administered by Defense Contract Management Agency for the benefit of the U.S. Army (the "Army IDIQ"). As one of the prime contractors on the IDIQ, Company A could compete with other

prime contractors for work to supply support services to components within the DoD, including personnel support, wellbeing support, and help desk support services.

c. In or about September 2011, Company A was awarded a task order as a prime contractor on the Army IDIQ to provide support services for the U.S. Army's Sexual Harassment / Assault Response and Prevention program (the "SHARP Contract."). Between in or about January 2012 and in or about September 2013, Company A subcontracted work to Company B on the SHARP Contract.

d. On or about July 13, 2012, the Mission and Installation Contracting Command within the DoD awarded Company A a task order under the Army IDIQ to perform work for the Office of the Secretary of Defense (the "OSD Contract"). Among other things, the OSD Contract required Company A to supply personnel to coordinate and supply certain services to wounded, ill, or injured services members at a fixed labor price to the United States government. Between in or around November 2012 and in or around July 2015, Company A subcontracted portions of the work under the OSD Contract to Company B through a series of purchase orders.

e. In or around June 2013, the United States Marine Corps awarded a prime contract to Company C to provide the United States Marine Corps Wounded Warrior Regiment with, among other things, recovery care coordinators to oversee and assist with the recovery and rehabilitation of wounded veterans (the "RCC Contract"). Company C subcontracted portions of the work on the RCC contract

3

to Company A, and Company A further subcontracted portions of this work to Company B.

8. Prior to 2010, neither Company B nor Persons 1 and 2 had any experience or expertise in providing services to injured or wounded persons, organizing or managing training in adaptive sports or athletic reconditioning, providing services to veterans, or federal government contracting.

## II. Criminal Scheme

9. Between no later than in or about 2010 and in or about July 2015, THOMSON engaged in a scheme and artifice to defraud by depriving Company A of the intangible right of honest services through commercial bribes and kickbacks.

10. A purpose of the scheme was for THOMSON to unjustly enrich himself by soliciting and accepting kickbacks and bribes from Company B in return for THOMSON providing favorable treatment to Company B in connection with prime government contracts and subcontracts awarded to Company A, including favorable treatment in connection with the HHS Contract, the SHARP Contract, the OSD Contract, and the RCC Contract, and subcontracts or purchase orders related to those contracts. THOMSON solicited and accepted more than $4.1 million from Company B in exchange for influencing Company A to give Company B favorable treatment.

11. In furtherance of the scheme to defraud, and to accomplish its unlawful objects, the following manner and means were used, among others:

   a. Beginning around 2008 and continuing through 2010, THOMSON urged Person 1, who THOMSON had known for many years, to start a defense contracting business. THOMSON advised Person 1 that THOMSON could help Person 1 make money

4

as a defense contractor, even though Person 1 had no experience in or knowledge of the industry. In early 2010, Person 1 established Company B at THOMSON's suggestion and with his guidance.

b. Beginning no later than 2010, THOMSON used his influence at Company A to steer work to Company B. Initially, THOMSON steered small projects to Company B for which THOMSON did not demand kickback payments. However, THOMSON told Person 1 that when THOMSON began to drive more business to Company B, THOMSON expectedto receive a portion of Company B's profits in return.

c. Between 2010 and 2015, THOMSON solicited and accepted payments from Company B in exchange for THOMSON using his position at Company A to provide favorable treatment to Company B, including influencing the award of work to Company B on Company A's prime government contracts and subcontracts.

d. THOMSON periodically directed Company B how much to invoice Company A for the labor Company A subcontracted to Company B on federal government prime contracts and subcontracts.

e. THOMSON directed Company B to pay THOMSON a percentage of Company B's profits on the labor invoiced to Company A.

f. Beginning in or around June 2013, THOMSON directed Company B to pay THOMSON and two other employees of Company A each a percentage of Company B's profits on the labor invoiced to Company A under the RCC Contract.

g. In order to conceal the true nature of the payments from Company B to THOMSON, THOMSON referred to the kickback payments as consulting fees and instructed Person 1 and Person 2 to do the same.

h. THOMSON also created a sham consulting agreement and six sham sales agreements to make it appear as though the payments from Company B to THOMSON were for commercial business plans unrelated to federal government contracts and subcontracts, when in truth and in fact, the payments from Company B were in exchange for THOMSON using his position to influence Company A to provide favorable treatment to Company B. The sham sales agreements included the sale of a business plan for after-market car horns and advisory services for a purchase price of $1,246,205.14, the sale of a business plan for Christmas tree broker services and advisory services for a purchase price of $854,407.75, and the sale of a business plan for mobile towing and storage and advisory services for a purchase price of $642,467.86. The total combined purchase price for all six sales agreements was $4,205,463.85.

i. Between approximately April 2012, and approximately March 2015, THOMSON solicited and accepted at least 15 kickback payments from Company B, which together totaled approximately $4,136,502.95. On June 19, 2015, THOMSON solicited an additional $62,000.04 in kickback payments from Company B, but Company B did not issue the requested payment.

j. THOMSON did not disclose to Company A that he was receiving payments from Company B for his personal use.

12.     On or about June 17, 2015, for the purpose of executing the above-described scheme, THOMSON transmitted by means of wire and radio communication in interstate commerce an email to Person 1 and Person 2, with a subject line of "Re: Labor Info for Brodie to price Camps/Clinics April/May," from an electronic device in the Eastern District of Virginia to an electronic device in Oregon. In that email, THOMSON instructed Person 1 and Person 2 how much Company B should mark up its labor when billing Company A for particular services Company B performed. THOMSON also spelled out his calculation of the kickbacks Company B owed him on the specified work, referring to that amount as "Total Consulting Fee."

### III.    Conclusion

13.     The foregoing statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case.

14.     The actions of the defendant, as recounted above, were in all respects done knowingly and willfully, and were not committed by mistake, accident, or other innocent reason.

### Other Pertinent Facts

The defendant, BRODIE SHAW THOMSON, stipulates and agrees that the following allegations are true and correct to the best of his knowledge and belief. The United States stipulates and agrees that the following allegations are true and correct to the best of its knowledge, based on the proffer provided by counsel for BRODIE SHAW THOMSON and a

limited review of evidence and information obtained by the government relating to the allegations.

15. When the United States Marine Corps awarded the RCC contract to Company C in June 2013, the contract stated that it was a shorter-term bridge contract until the Marine Corps could award a new contract. The recipient of the new contract would be selected through competition among qualified small businesses.

16. In later 2013 and early 2014, the defendant and Person 1 collaborated on Company B's proposal to the Marine Corps for the upcoming RCC contract. Company B was eligible to compete for the contract because it had followed the prescribed process for self-certifying as a qualified small business with the United States Small Business Administration ("SBA"). The defendant provided Person 1 with assistance and expertise on writing the proposal. The defendant also caused one of the two Company A employees described above in paragraph 11f to assist in drafting the proposal. The defendant and Person 1 agreed that if Company B were awarded the upcoming RCC contract, Company B would then subcontract part of the work to Company A.

17. On or about December 30, 2013, Company B submitted its initial proposal to the Marine Corps for the upcoming RCC contract, and on April 25, 2014, the Marine Corps awarded the contract to Company B. A company that had submitted a losing proposal, however, filed a bid protest. The protest alleged, among other things, that Company B was not truly a qualified small business because it was too closely affiliated with Company A pursuant to the provisions of 13 C.F.R. § 121.103. In September 2014, after reviewing relevant information, the SBA agreed that Company B was affiliated with Company A and, therefore, was not a qualified small business. On October 22, 2014, the award of the new RCC contract to Company B was rescinded.

18. In 2013 and 2014, Company A also teamed with Company D on some contracts. Company D had self-certified with the SBA that it was a service-disabled veteran owned small business ("SDVOSB"). To self-certify, Company D had to certify that a service-disabled veteran owned the majority of the company and that the company was controlled by the same or another service-disabled veteran. The self-certification allowed Company D to compete for contracts that the government had decided were to be awarded to either a SDVOSB or a small business. The certification also permitted Company D to seek subcontracts from other prime contractors, such as Company A, so that the primes could satisfy government goals for the percentages of subcontracts that the government wanted the primes to give to SDVOSBs and/or other small businesses.

19. On September 26, 2014, the Washington Headquarters Services office at the Pentagon awarded an IDIQ contract to Company D as a SDVOSB, which enabled Company D to obtain purchase orders valued at millions of dollars and subcontract some of the work to Company A.

20. On or about October 2, 2014 the owner of Company D emailed the defendant expressing the owner's concern that Company D was not capable of taking on the work that the company would receive pursuant to the IDIQ contract. The defendant assured the owner that he would make sure that Company D would be able to handle the work.

21. On or about October 22, 2014, the owner of Company D emailed the defendant and inquired whether the defendant was interested in buying Company D. The defendant began consulting with others, including an attorney, about how to arrange a purchase of the company by a service-disabled veteran. In an email dated January 12, 2015, the attorney presented two options for structuring the sale and recommended the first, which the attorney stated, "will give Brodie a better chance to get what he wants (effective 100% control)." Under this option, the defendant

would have bought 49 percent of Company D and loaned the money to a service-disabled veteran to buy the other 51 percent. This exchange was representative of the ongoing discussions but did not reflect the final structure of the new company.

22. As the defendant considered how to arrange the purchase of Company D, he also considered how he should participate in the affairs of the company if the purchase occurred. The defendant wanted his role to be such that (1) Company A would not know about his role in Company D, (2) companies that lost bids on contracts awarded to Company D would not protest that Company D was improperly affiliated with Company A, and (3) Company D would not lose its qualification as a small business or an SDVOB, as had occurred with Company B losing its small business status due to its affiliation with Company A.

23. Ultimately, the defendant decided with others how to structure the purchase and his role. The defendant talked to Person 3, a service-disabled veteran who worked for a government contractor, about purchasing 51 percent of Company D. Person 3 agreed to do so if the defendant could arrange for financing. The defendant also talked to Person 4, a long-time friend, about buying the other 49 percent of Company D. Person 4 had experience in providing services on contracts for the Wounded Warrior Program. Person 4 agreed to make the purchase after the defendant said that financing could be made available to Person 4.

24. On or about March 10, 2015, Person 3 bought 51 percent of the ownership in Company D for $133,875 and other consideration, and Person 4, through an LLC Person 4 had established on the advice of the defendant and for which Person 4 was the sole owner ("Person 4's LLC"), bought a 49 percent ownership stake in Company D for $128,625. The defendant financed both purchases as follows: The defendant made an unsecured loan of $800,000 to Person 4, and Person 4 in turn loaned some of the money to Person 4's LLC, to cover the full price of the

purchase of 49 percent of Company D. Person 4 also lent Person 3 $671,375 to cover both the money that Person 3 needed to purchase a 51 percent share of Company D and the initial operating expenses of Company D. Person 4's loan to Person 3 was secured by all of Person 3's interest in Company D. The principal and three percent annual interest on the defendant's $800,000 loan to Person 4 were not due until 30 days following a demand by the defendant. The defendant did not make a demand, and Person 4 did not repay the loan until 2018 after Person 3 and Person 4 had sold their ownership interests in Company D.

25. After the purchase of Company D, Person 3 participated in running the company, but also maintained a full-time job elsewhere and was at times drawn away to care for a family member with medical problems. Person 4 had never intended to have a role in running Company D. Instead, Person 4's LLC received purchase orders from Company D to perform services on contracts for the Wounded Warrior Program.

26. Beginning no later than July 2015 and while still employed by Company A, the defendant began conducting business affairs for Company D using the name, "David Hale," to conceal his involvement in Company D. The defendant communicated with employees of Company A, subcontractors, and government procurement officials using that name. For instance, on September 15, 2016, the defendant, as David Hale, sent an email to two U.S. government officials stating that Company D would like to submit documents related to a contract proposal to the United States' government through an alternate email address. The defendant's email from the David Hale email account included attachments related to Company D's contracting proposal, including Company D's responses to two Evaluation Notices from the government and corresponding technical and price changes.

27. On December 17, 2015, the defendant in his capacity as a Company A employee, sent an email to another DOD procurement official introducing "David Hale" as a point of contact for Company D. The defendant even concealed his role at Company D from Person 3, the 51 percent owner, and Person 4, the 49 percent owner, by emailing with Persons 3 and 4 as "David Hale" and not telling Persons 3 or 4 that the defendant was in fact David Hale. Furthermore, the defendant enlisted the assistance of Company A employees to perform office work for Company D. Among those persons were the two employees described in paragraph 11f above.

28. In or about October 2015, Company D, at the suggestion of the defendant, hired Person 5, a director and program official of Company A, to become the Chief Operating Officer for Company D and occupy the role as the service-disabled veteran in control of Company D. Thereafter, Person 5 ran the day-to-day operations of Company D, and, according to Person 5, the defendant continued to make the strategic decisions for Company D.

29. During the period that Company D was owned by Persons 3 and 4, Company D performed on several government contracts with Company A, sometimes as a prime contractor and sometimes as a subcontractor. In addition, in December 2015, the defendant, in his capacity as Senior Vice-President of Company A, wrote a letter to the United States Army Contracting Command to support Company D's request to novate two substantial contracts to Company D that earlier had been awarded to another small business that had declared bankruptcy in August 2015. The defendant expressed a "strong endorsement" for novating one of the contracts to Company D, stating the Company A had a "strong favorable existing relationship" with Company D.

30. On or about July 1, 2017, Person 3 sold the 51 percent ownership interest in Company D, and on or about January 1, 2018, Person 4 sold the LLC's 49 percent ownership interest in Company D. After the sale, both Persons 3 and 4 repaid their loans that the defendant

had financed, directly or indirectly, at the time of the purchase of Company D. The defendant resigned from Company A in or about October 2017, and began his disengagement from Company D soon after that time.

31. In December 2016, Person 4's LLC received all or most of the profits made by Company D during 2016, which was approximately $3.2 million. In December 2017, Person 4's LLC received approximately $1.7 million, a portion of the profits made by Company D during 2017. After the first receipt of profits and after paying taxes, the defendant requested that Person 4 make gifts in specific amounts to the defendant to himself, two of the defendant's relatives, and the two Company A employees identified above in paragraph 11f. Person 4 did so as the defendant had asked, and the gifts totaled $140,000. Person 4 moved the remaining profit money from the LLC account into a trust account that the defendant had caused to be created. Eventually, Person 4 became the beneficiary of the trust, but has not withdrawn any of the money to date.

32. From or related to the operation of Company D after March 10, 2015 and the sales of Company D stock, the only money that the defendant personally received, directly or indirectly, such as from others or through Person 4's LLC, were: (1) the repayment in full of the defendant's loan to Person 4, including interest, in June 2018, (2) two checks for reimbursements of expenses totaling approximately $52,121.59, and (3) monetary gifts from Person 4 mentioned above totaling $28,000.

33. At no time did the defendant give, offer, or promise anything of value to a public official, directly or indirectly, for or because of any official act, or with the intent to influence any official act; to influence a public official to commit, collude in, or allow a fraud against the United States; or to influence a public official to act in violation of such official's duty.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Date: 6-18-2020         By: _____
                             Heidi Boutros Gesch
                             Jack Hanly
                             Kimberly R. Pedersen
                             Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, BRODIE SHAW THOMSON, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the facts alleged in the section, Facts Relating to Charged Offenses, beyond a reasonable doubt.

*[signature]*
BRODIE SHAW THOMSON

I am Adam B. Schwartz, the defendant's attorney. I have carefully reviewed the above Statement of Facts with the defendant. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

*[signature]*
Adam B. Schwartz, Esquire
Attorney for BRODIE SHAW THOMSON